**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| | : | 07-CV-3628 |
| Plaintiff, | : | Civil Action No. |
| | : | |
| v. | : | |
| | : | |
| Kan King Wong and Charlotte Ka On Wong Leung, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY**
**MOTION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER FREEZING**
**ASSETS AND OTHER RELIEF AND FOR AN ORDER TO**
**SHOW CAUSE WHY THE ASSET FREEZE SHOULD NOT CONTINUE**

Plaintiff, the Securities and Exchange Commission (SEC or Commission), filed this suit

against defendants Kan King Wong and Charlotte Ka On Wong Leung, to halt their illegal

insider trading in the stock of Dow Jones Company, Inc. (DJ). In conjunction with the filing of

the complaint, the SEC respectfully requests that the Court issue an order temporarily freezing

two accounts held by defendants at a branch office of Merrill Lynch & Co. (Merrill Lynch) in

Hong Kong holding over $8,000,000 worth of DJ common stock and/or cash proceeds of the sale

of that stock, and requiring defendants to show cause why the assets should not remain frozen until

the conclusion of this lawsuit.

Without an asset freeze, any relief the Court grants in this case could be meaningless.

Defendants are residents of Hong Kong. The 415,000 shares of DJ common stock valued at over

$8,000,000 that they purchased in advance of an announcement that News Corporation (News

Corp.) would purchase DJ for $60.00 per share is in the Hong Kong branch office of Merrill

Lynch & Co. (Merrill Lynch). On May 4, 2007, defendants have placed an order with Merrill Lynch to sell all 415,000 shares of the DJ stock. As detailed below, defendants purchased DJ stock on the basis of material non-public information. Consequently, the Commission has requested that the Court order defendants to disgorge the ill-gotten gains from their insider trading, and to assess monetary penalties against them.

Enforcing any such judgment will prove difficult, however, if defendants are free to liquidate their stock position -- which they have already placed an order to do -- currently held at Merrill Lynch's Hong Kong branch and move the proceeds to a foreign institution beyond this Court's jurisdiction. Accordingly, the Commission respectfully requests that the Court freeze the accounts containing the 415,000 shares of DJ stock or, in the alternative, the cash proceeds of the sale of the DJ shares currently worth approximately $8,183,423 to ensure that assets are available to help satisfy any judgment the Court may enter. Because these are the only accounts of defendants that the Commission seeks to freeze there will be little or no prejudice to defendants as a result.

## STATEMENT OF FACTS

On the afternoon of May 4, 2007, personnel at the SEC's headquarters in Washington, D.C. received information regarding suspicious trading in two accounts (xxxxx-8105 and xxxxx-0D46) held at the Hong Kong branch of Merrill Lynch, a broker registered with the Commission. Defendants purchased a total of 415,000 shares of DJ stock prior to the May 1, 2007, public announcement that News Corp. had proposed to acquire DJ at a price of $60.00 per share. Prior to the May 1, 2007 announcement, DJ stock had been trading at approximately $37.00 per share. Anthony Declaration (Dec.) ¶¶ 4-6, 13, 23-27.

The account in which the stock was purchased is owned by defendants, Kan King Wong and his wife Charlotte Ka On Wong Leung, both residents of Hong Kong. Defendants began purchasing DJ stock on April 13, 2007, and made their last purchase on April 30, 2007, the day prior to the acquisition announcement. Defendants purchased the 415,000 shares at a cost of $15,023,215. This enormous stock purchase was funded with four separate transfers of funds from outside of the Merrill Lynch account. On April 18, 2007, an individual -- Leung Kai Hung Michael, the father of Charlotte Ka On Wong Leung -- transferred by wire $3,188,600 to the Merrill Lunch account in Hong Kong. On April 20, 2007, defendants transferred by wire another $3,986,727 from an account at JP Morgan Int'l Bank in Brussels, Belgium. Finally, on May 3, 2007, after the purchases were made, two margin loans for $335,157 and $4,500,000 respectively were posted in the Merrill Lynch account. Anthony Dec. ¶¶ 4, 8, 13-22.

On May 1, 2007, the day after defendants had completed their $15,023,215 purchase of DJ stock, the price of the DJ stock increased from approximately $37.00 per share to approximately $57.00 per share, a 58 percent increase in value. Anthony Dec. ¶ 25. On May 7, 2007, the Commission learned that defendants had placed an order to sell all 415,000 shares of the DJ stock. When making the sell order, defendant Kan King Wong asked Merrill Lynch when the sale settlement would take place. Anthony Dec. ¶ 27. As of May 4, 2007, defendants' profit on the 415,000 shares is approximately $8,183,423. Anthony Dec. at ¶ 25.

Prior to April 13, 2007, defendants had no history of trading DJ stock in their Merrill Lynch accounts. Defendants' other stock holdings in the Merrill Lynch account total approximately $606,600 approximately four percent of the current value of the DJ stock. Anthony Dec. ¶ 21. The DJ stock purchase increased the value of defendants' Merrill Lynch portfolio by approximately 25 times. Prior to the DJ stock purchase, defendants' Merrill Lynch

3

portfolio contained mainly fixed income assets. As of April 30, 2007, the only U.S. equity

position defendants held was a 2,500 share position in Intel, worth $53,750. Id.

**ARGUMENT**

**I.    AN ORDER FREEZING THE DJ PROCEEDS IS APPROPRIATE AND NECESSARY TO PROTECT THE PUBLIC INTEREST**

In civil enforcement actions brought by the Commission, courts have broad power to

order defendants to disgorge their unlawful profits. See, e.g., SEC v. First Jersey Securities, Inc.,

101 F.3d 1450, 1474 (2d Cir. 1996). In calculating disgorgement, only a "reasonable

approximation" of defendants' profits is required, and "any risk of uncertainty [in calculating

disgorgement] should fall on the wrongdoer." Id. at 1475.

The proceeds from defendants' trading in DJ stock during the time period of the fraud

alleged in the complaint should be preserved during the pendency of this action, so that they will

be available for disgorgement. To obtain an asset freeze, all the Commission need show is "that

it is likely to succeed on the merits," SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998), or that

"there is a basis to infer that the appellants traded on inside information." SEC v. Unifund SAL,

910 F.2d 1028, 1041 (2d Cir. 1990). Unlike a private litigant, the Commission need not show

the risk of irreparable injury. Cavanagh, 155 F.3d at 132. "An asset freeze requires a lesser

showing" than that required for a preliminary injunction enjoining violations of the securities

laws. Cavanagh, 155 F.3d at 132; SEC v. Unifund SAL, 910 F.2d 1028, 1041 (2d Cir. 1990);

SEC v. Heden, 51 F.Supp. 2d 296, 298 (S.D.N.Y. 1999). "[T]he strength of the showing required

varies inversely with the severity of the restraint sought." SEC v. Bremont, 954 F. Supp. 726,

729-30 (S.D.N.Y. 1997). In seeking an asset freeze to preserve assets, the Commission need not

establish "likelihood of future violations." SEC v. Unifund SAL, 910 F.2d 1028 (2d Cir. 1990).

4

In <u>SEC v. Unifund SAL</u>, 910 F.2d 1028, the Second Circuit made clear that an asset
freeze may be ordered even where the Commission has not presented sufficient evidence to
obtain the "traditional" preliminary injunction against continuing statutory violations. <u>Id</u>. at
1041. The Court reasoned that an asset freeze could be imposed with a lesser showing because
"the freeze order does not place [defendants] at risk of contempt in all future securities
transactions. It simply assures that any funds that may become due can be collected." <u>Id</u>. at
1041.

Courts issue asset freeze orders in Commission enforcement cases to preserve assets: (i)
for payment of disgorgement of illegal profits from securities transactions, <u>International Controls</u>
<u>Corp. v. Vesco</u>, 490 F.2d 1334, 1347 (2d Cir. 1974); (ii) for payment of civil monetary penalties,
<u>SEC v. Unifund SAL</u>, 910 F.2d at 1042 (citing <u>United States v. First Nat'l City Bank</u>, 379 U.S.
378, 385 (1965)); and (iii) for payment of prejudgment interest. <u>SEC v. First Jersey Securities,</u>
<u>Inc.</u>, 101 F.3d at 1476.

A freeze order may be directed to parties and also to non-parties allegedly holding funds
of a defendant. <u>United States v. First Nat'l City Bank</u>, 379 U.S. 378, 384 (1965); <u>see also</u> <u>SEC v.</u>
<u>Heden</u>, 51 F.Supp. 2d at 299. A freeze order may also operate as to assets that are not traceable
to the illegal activity. <u>SEC v. Grossman</u>, 887 F. Supp. 649, 661 (S.D.N.Y. 1995), <u>aff'd</u>, 101 F.3d
109 (2d Cir. 1996).

In this case, there is a well-founded basis for concluding that defendants engaged in insider
trading. Defendants acquired a massive position, 415,000 shares of DJ common stock, within the
two weeks prior to the announcement of an offer by News Corp. to buy DJ for $60.00 per share.
Anthony Dec. ¶¶ 13, 23-25. Defendants spent more than one week transferring in millions of dollars

from defendant Charlotte Ka On Wong Leung's father, a bank in Brussels, Belgium, and two margin loans in order to purchase the shares. Anthony Dec. ¶¶ 14-22.

Moreover, on May 4, 2007, defendants placed an order to liquidate their entire position in the DJ stock, thereby demonstrating their intent to dissipate such assets or move them beyond the jurisdiction of this Court. Such proceeds will be available to defendants on May 9, 2007. Indeed, defendant Kan King Wong specifically asked when the proceeds would be available. Anthony Dec. ¶ 27. Defendants are non-U.S. parties with known accounts in Hong Kong and Belgium and that conduct their securities purchases through branch offices of U.S. broker dealers in Hong Kong. Anthony Dec. ¶¶ 13, 17. Moreover, defendants borrowed a significant portion of the funds used to purchase the DJ shares and presumably will repay these loans with the proceeds of the stock sales. Anthony Dec. ¶¶ 16-19. Accordingly, absent intervention by this Court, the subject securities positions will be liquidated and the resulting proceeds, including suspicious profits of approximately $8,183,423 will be available to defendants and are almost certain to be wire transferred to foreign entities or individuals over which the Court has no jurisdiction. Anthony Dec. ¶¶ 28-30.

An immediate order freezing the proceeds from the sales of the subject securities is essential if there is to be any hope of enforcing a potential judgment.

II.     **Strong Circumstantial Evidence Suggests That Defendants Violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5**

A person is liable pursuant to Section 10(b) and Rule 10b-5 when he obtains material nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." Dirks v. SEC, 463 U.S. 646, 654 (1983); United States v. Newman, 664 F.2d 12 (2d Cir. 1981). Such a duty arises where the

person is an "insider,"[1] a "temporary insider,"[2] an employee entrusted with confidential information by his employer,[3] or a tippee of any of the foregoing who knew or should have known that the information was obtained in breach of a duty.[4]

Furthermore, in the case of a tippee, liability may be established where an insider transmits the information to another and "receives a direct or indirect personal benefit from the disclosure, such as pecuniary gain or a reputational benefit that will translate into future earnings . . . [or] when an insider makes a gift of confidential information to a trading relative or friend." Dirks v. SEC, 463 U.S. at 663-64.

The information concerning the proposed acquisition of DJ by News Corp. was nonpublic and material. In these types of transactions, both the target company and the potential acquiring company take steps to ensure that information pertaining to the proposed transaction remains confidential until the transactions are announced.

Few matters, if any, are more material than a corporation's involvement in a possible merger or acquisition. SEC v. Sekhri, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002) (citations and internal quotations omitted). See e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); SEC v. Musella, 748 F. Supp. 1028 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir.), cert. denied sub nom. DeAngelis v. SEC, 498 U.S. 816 (1990); SEC v. Tome, 638 F. Supp. 596, 623

---

[1]     See, e.g., SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 (1969).

[2]     See, e.g., SEC v. Lund, 570 F. Supp. 1397 (C.D. Cal. 1983).

[3]     See, e.g., SEC v. Materia, 745 F.2d 197 (2d Cir. 1984), cert. denied, 471 U.S. 1053 (1985); SEC v. Musella, 578 F. Supp. 425 (S.D.N.Y. 1984).

[4]     See, e.g., Dirks v. SEC, 463 U.S. at 660.

(S.D.N.Y. 1986).[5] Moreover, the market reaction alone to the public announcement of the transaction, reflected in the dramatic increase in the price of DJ stock – of approximately 58 percent – on the day of the announcement, demonstrates that the information was viewed "by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. at 231-32 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 439, 449 (1976)); Anthony Dec. ¶ 25.

The circumstantial evidence developed by the Commission in just a few days provides more than sufficient basis for inferring that illegal insider trading has occurred. This information includes the highly suspicious timing of defendants' purchases of DJ stock in the two weeks leading up to the announcement that News Corp. was offering to purchase DJ and the enormous profits (over $8 million) that defendants stand to gain as a result of such trades. Anthony Dec. ¶¶ 4, 13-27. Additionally, the large volume of shares (415,000 shares) purchased by defendants is unusual in light of the history of trading in their Merrill Lynch account and in light of the announcement, highly suspicious. Prior to April 13, 2007, defendants had not traded in DJ securities in their Merrill Lynch account. Prior to the DJ stock purchase, defendants' Merrill Lynch portfolio contained mainly fixed income assets. As of April 30, 2007, the only U.S. equity position defendants held was a 2,500 share position in Intel, worth $53,750. Anthony Dec. ¶ 21.

This volume, which represents more than three percent of all of the shares of DJ traded from April 13, 2007 through April 30, 2007, suggests that defendants were confident that stock price would rise. Anthony Dec. ¶ 20. The DJ stock purchased increased defendants' Merrill Lynch

---

[5]    This Circuit has repeatedly sustained findings that information concerning proposed corporate acquisitions or mergers is material. See, e.g., SEC v. Geon Industries, Inc., 531 F.2d 39, 47-48 (2d Cir. 1976); SEC v. Shapiro, 494 F.2d 1301, 1307 (2d Cir. 1974).

account portfolio by approximately 25 times. Indeed, the market value of all of defendants other assets held in the Merrill Lynch accounts is less than four percent ($606,600) of the market value of their DJ stock. Anthony Dec. ¶ 21.

Moreover, defendants made a conscious effort to wire transfer millions of dollars into their Merrill Lynch account and obtain loans to make the massive purchase. Anthony Dec. ¶¶ 13-19. Absent material nonpublic information, it is unlikely that defendants would have spent over $15 million to purchase 415,000 shares of a stock that had not moved significantly in price over the last three months, hovering between $32.00 and $39.00 per share (not exceeding $40 per share since August 2005), unless they were in possession of material non-public information. Anthony Dec. ¶ 22.

One who trades in securities while in possession of information that he knows or has reason to know is confidential and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-46 (2d Cir.), cert. denied, 438 U.S. 1039 (1978).

The law does not require direct evidence of scienter: as the Supreme Court has stated, "proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983). This is especially true in insider trading cases: "[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." SEC v. Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (quoting SEC v. Bluestone, [1990-1991 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,880 (E.D. Mich. Jan. 24, 1991). Accord, SEC v. Musella, 678 F. Supp. 1060, 1062-63 (S.D.N.Y. 1988). Indeed, most insider trading cases are based on circumstantial evidence; "there are generally two people who can provide direct evidence that insider trading has occurred -- the

source of the information and the trader. It is very rare for one of these two persons to admit that they have engaged in insider trading." Elysian Federal Savings Bank v. First Interregional Equity Corp., 713 F. Supp. 737, 744 (D.N.J. 1989) (quoting H.R. Rep. No. 100-09190, 100th Cong., 2d Sess. at 15, U.S. Code Cong. & Admin. News 1988, p. 6052).

This case is similar to other insider trading cases where the SEC sought and obtained emergency relief based on circumstantial evidence that the defendants engaged in illegal insider trading. For example, in SEC v. Heider, 1990 U.S. Dist. LEXIS 16246 (S.D.N.Y. 1990), the court entered an asset freeze and preliminary injunction against certain overseas defendants who had purchased large quantities of call options of Contel Corporation just prior to its merger with GTE Corp, notwithstanding the fact that the Commission had not identified the source of the material, non-public information. In the context of denying defendants' motions to dismiss and Rule 9(b) motion, the court recognized:

> Although the S.E.C. has not named the source of the material, non-public information allegedly used by defendants . . . the circumstances surrounding the defendants' purchases are sufficient to draw a "strong inference" that they had scienter. . . . This extraordinary trading activity provides circumstantial evidence that the three defendants making these motions had scienter to commit fraud.

Id. at *11-12. Likewise, in Unifund, the Second Circuit upheld the District Court's entry of an asset freeze, despite the fact that the Commission was unable to identify the person who tipped the trading defendants.

The timing and circumstances of defendants' purchases of DJ stock are highly suspicious. Defendants' trading was of an usually high trading volume, was completed within a week of the public announcement of News Corps.'s offer to acquire DJ, and now defendants have placed an order to sell their entire position just days after the price of the stock increased following the public announcement. This is strong circumstantial evidence that defendants traded while in possession of

material non-public information in violation of Section 10b of the Securities Exchange Act and Rule 10b-5.

## III.    AN ORDER GRANTING EXPEDITED DISCOVERY IS APPROPRIATE

The Commission seeks to depose witnesses, subpoena bank and brokerage records and other documents, and take other discovery on an expedited basis prior to a hearing on its order to show cause for a preliminary injunction continuing the asset freeze during the pendency of this litigation. Due to the gravity of this situation, the Commission has brought this action expeditiously and has not had an opportunity to interview all persons who have information relevant to this matter, or to take any investigative testimony. The opportunity to take discovery prior to the hearing on the continuation of the asset freeze will enable the Commission to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at such a hearing. Expedited discovery will also assist the Commission in properly effectuating any order entered by this Court freezing the accounts in which the illegal securities trades occurred.

## IV.    AN ORDER REQUIRING IDENTIFYING INFORMATION IS
         NECESSARY TO CONDUCT THIS LITIGATION EFFECTIVELY

The Commission also seeks an order requiring each defendant to promptly submit identifying information to this Court and the SEC, including (a) its name, all business and residence addresses, postal box numbers, electronic mail addresses, telephone numbers, facsimile numbers, and nationality; and (b) a listing of each account with any financial institution or brokerage firm maintained by them. Such identifying information will assist the Commission in pursuing discovery and in effectuating the asset freeze, and will ensure that the Commission is able to effect service in a manner most likely to provide prompt actual notice.

11

## V.    AN ORDER SHOULD ISSUE PERMITTING ALTERNATIVE MEANS OF SERVICE

Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may authorize alternative means for service of process in foreign countries.  The Commission respectfully requests that the Court authorize service upon the defendants by serving them, in the manner described in the Commission's proposed order, through the United States and foreign entities that have acted as defendants' agents, namely Merrill Lynch, the U.S. brokerage firm through which their DJ stock was purchased.  The SEC will also make every effort to serve the defendants under Rule 4(f) and the Hague Convention.

## VI.    AN ORDER SHOULD BE ISSUED PREVENTING THE ALTERATION OR DESTRUCTION OF DOCUMENTS

In order to protect all documents necessary for full discovery in this matter, the Commission seeks an order preventing the alteration or destruction of documents.  Such "innocuous" orders are routinely granted to protect the integrity of the litigation.  *See, e.g.,* <u>SEC v. Unifund SAL,</u> 910 F.2d at 1040 n.11; SEC v. Musella, 578 F. Supp. at 425.

## **CONCLUSION**

For these reasons, the Commission's request for emergency relief should be granted

Dated: May 8, 2007

Respectfully submitted,

*Reid A. Muoio*

Reid Muoio  (RM-2274)

*Jan M. Folena*

Jan M. Folena (pro hac vice pending)
Jason Anthony
Attorneys for Plaintiff
Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549-1040
Telephone: (202) 551-4738 (Folena)
Facsimile:  (202) 772-9246 (Folena)
folenaj@sec.gov

13